


**IN THE UNITED STATES DISTRICT COURT FOR THE**

**EASTERN DISTRICT OF VIRGINIA**

**Norfolk Division**

| | | |
|---|---|---|
| **UNITED STATES OF AMERICA** | ) | |
| | ) | |
| v. | ) | **Criminal No. 2:12cr112** |
| | ) | |
| **MICHELLE NICOLE HADDOCK** | ) | |

## STATEMENT OF FACTS

The parties stipulate that the allegations in Count One of the Criminal Information and the following facts are true and correct, and that had the matter gone to trial the United States would have proven them beyond a reasonable doubt.

1. In February 2012, special agents of the Department of Homeland Security, assigned to the HR-BEST (Hampton Roads Border Enforcement Security Task Force) began investigating a drug trafficking organization suspected of importing, possessing and distributing Methylone, a Schedule I controlled substance, into the Hampton Roads area of Virginia from Nanjing, China. On February 10, 2012, the United States Postal Inspection Service (USPIS) notified HR-BEST of multiple packages originating in Nanjing, China destined for an address on Sampson Place, Portsmouth, Virginia. These packages were identical to packages which had been identified in online purchases of Methylone and other controlled substances from another investigation.



2. On February 15, 2012, USPIS notified HR-BEST that it had intercepted a package from Nanjing, China, to the Sampson Place address. An extended border search of the parcel was completed by USPIS Inspector Dustin Holland. Inspection of the parcel revealed a sealed mylar bag containing approximately one kilogram of white crystalline powder. HR-BEST agents went to the Sampson Place address to conduct an interview with the occupants. Law enforcement officers learned that the intended recipient of the package did not live at the residence, but was residing at an address on Green Street in Portsmouth.

3. The investigative team went to the Green Street location and came in contact with MICHELLE NICOLE HADDOCK, who drove up in a black 2011 Dodge Avenger. After Agent Lewis initiated contact, HADDOCK allowed the agent and investigative team into her apartment. She then stated that she knew that "the packages" were what brought the agents there. She clarified that she meant the package delivered to the Sampson Place address. She stated that the package contained Butylone, an analogue of MDMA (3,4-methylenedioxy-N-methyamphetamine), commonly known as Ecstasy, a Schedule I controlled substance.

4. HADDOCK gave the agent and officers consent to search the house, and told them, "I'll show you where everything is." She took the officers to the closet in the home office. Inside the closet was "Butylone and other stuff," according to HADDOCK. Specifically, Portsmouth Police working with HR-BEST, recovered a large clear plastic container containing large quantities of white powder in multiple bags, several hundred United States Postal Service shipping envelopes and boxes. In addition, two firearms, one a Taurus .38 and the other a Smith & Wesson .40, were recovered from the top of the same closet where the powders were located. HADDOCK also turned over a parcel from her vehicle which she had just picked up from the





post office, which contained a money order payment from a drug customer in California.

5. The drug evidence was submitted to the Virginia Department of Forensic Science - Eastern Laboratory for analysis. The narcotics were assigned FS Lab #T12-1553 and examined by a forensic scientist. The lab determined that the recovered narcotics included 996.7 grams of Butylone, an analogue of 3,4-Methylenedioxy-N-methylcathinone (Methylone)[1]; 653 tablets of Dizaepam (which were not the FDA approved, prescribed medication); a total of 13.525 grams of 3,4-Methylenedioxy-N-methylcathinone (Methylone), a Schedule I controlled substance, and .840 gram of 4-Methylethcathinone, commonly known as 4-MEC, an analogue of Methcanthinone, a Schedule I controlled substance.

6. After being informed of her legal rights, HADDOCK elected to waive them and speak with Special Agent Lewis. According to HADDOCK, a co-conspirator, M.H., started a business selling synthetic drugs in March 2011. She was initially reluctant but agreed due to financial troubles. M.H. began the business by purchasing fifty (50) grams of methylone from a lab in China for the purpose of distributing it. He used web-sites such as www.alteredstates.com and www.euphoricknowledge.com to market the synthetic drugs, including methylone, under the business name "Happy Scrappy Catnip." The drugs would be labeled "not for human consumption" to prevent legal issues. However, HADDOCK stated that the drugs were purposefully marketed for human use to get high; however, they could not say that.

---

[1] In February 2012, the DEA determined that Butylone was an analogue of Methylone, having a substantially similar chemical structure with the same core phenethylamine structure and only differing by only the alkyl group substitution at the alpha position. The physiological effect of Butylone is the same as Methylone, as the two substances both are central nervous system stimulants and laboratory testing on animals reveal that Butylone and Methylone cause similiar physical reactions. The DEA has determined that Methylone typically has about half the potency of MDMA, commonly known as Ecstasy. Butylone would have about the same potency.





7. HADDOCK admitted that M.H. had received approximately thirty (30) bulk packages from Chinese laboratories of controlled substances and analogues which were then repackaged by them and mailed throughout the United States through the U.S. Postal Service. HADDOCK admitted that they tried "to stay one step ahead of the bans" by purchasing analogues of controlled substances. She admitted that they had sold Butylone, Pentylone, 5-MEO-MIPT, 4-ACO-NBOME, 25I-NBOME, MXE, 4-FA, 4-FMA, 4-MEO-PCP, and AM-1248. Payments were received via the mail in cash, or using Green Dot, Moneypaks, PaybyWeb, PayPal, and money orders. HADDOCK did not handle the day-to-day operations of the dealings generally, but took over for M.H. in early February 2012 when he was deployed as a civil service mariner with the U.S. Navy's Military Sealift Command. Agents recovered a "TIPS AND TRICKS" cheat-sheet M.H. made for HADDOCK for her to continue the business while he was away. The document included information on the bank accounts, email accounts, websites, payments, customer bulk order procedures, a how-to-guide on ordering drugs from the labs, and their stamps.com account. Further, the document warned of customers who requested an address or phone number from them when the order was placed as they "smell[ed] like bacon," referring to law enforcement. Also, HADDOCK was to avoid paper trails (other than printing off an order to fill it) and to use only certain addresses so any personal addresses were not exposed.

8. According to MICHELLE HADDOCK, she and M.H. grossed approximately $250,000 in sales between March 2011 and February 2012. They had gone on a vacation and had paid cash for the 2011 Dodge Avenger that HADDOCK was operating on February 15, 2012, using the drug proceeds.





9. The acts of the defendant in furtherance of the offense charged in this case, including the acts described above, were done willfully and knowingly with the specific intent to violate the law. The defendant acknowledges that the foregoing statement of facts does not describe all of the defendant's conduct relating to the offenses charged in this case nor does it identify all of the persons with whom the defendant may have engaged in illegal activities. The defendant further acknowledges that she is obligated under her plea agreement to provide additional information about this case beyond that which is described in this statement of facts.

NEIL H. MACBRIDE
UNITED STATES ATTORNEY

By: ______________________
Amy E. Cross
Special Assistant United States Attorney





Defendant's Signature: After consulting with my attorney and pursuant to the plea agreement entered into this day between myself, the United States and my attorney, I hereby stipulate that the above Statement of Facts is true and accurate, and that had the matter proceeded to trial, the United States would have proved the same beyond a reasonable doubt.

MICHELLE NICOLE HADDOCK
Defendant

Defense Counsel's Signature: I am MICHELLE NICOLE HADDOCK's attorney. I have carefully reviewed the above Statement of Facts with her. To my knowledge, her decision to stipulate to these facts is an informed and voluntary one.

Anthony Gantous, Esquire
Attorney for the Defendant